## ELEVATOR SUPPLIES CO., Inc., v. BOEDTCHER.

(Circuit Court of Appeals, Third Circuit. February 15, 1926. Rehearing Denied March 30, 1926.)

No. 3298.

**I. Patents ⬡⟶328.**

Herzog patent, No. 1,028,089, claims 1, 6, 8, 32, 45, 50, 60, 86, 91, and 94, for elevator signaling device, *held* not infringed.

**2. Patents ⬡⟶328.**

Newell patent, No. 1,160,315, claim 22, for elevator signaling device, *held* not infringed.

**3. Patents ⬡⟶328.**

Andren patent, No. 1,109,950, claims 2, 9, 10, 11, 12, and 14, for elevator signaling device, *held* not infringed.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Patent infringement suits by the Elevator Supplies Company, Incorporated, against Franz A. Boedtcher. From decrees dismissing the bills, plaintiff appeals. Modified, and, as modified, affirmed.

For opinion below, see 11 F.(2d) 609.

Emerson R. Newell and H. Dorsey Spencer, both of New York City, for appellant.

Richard Eyre, of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. Referring to the parties in the singular number and as they stood in the trial court, the plaintiff brought separate suits against the defendant for infringement of three patents. They were consolidated for trial and on findings of noninfringement in one opinion three decrees were entered dismissing the bills of complaint. These appeals followed.

Many patents are involved; but three are in suit. All relate to the highly technical and now highly developed art of electric signalling apparatus and circuits, familiar in their operative results to every one who rides in hotel and office building elevators. Those in suit are patents to Herzog, No. 1,028,089, Newell, No. 1,160,315, and Andren, No. 1,-109,950.

We cannot within the permissible bounds of an opinion compare and discuss the apparatus of the patent art and of the contesting parties; nor shall we go into details even to the extent found in the opinion of the learned trial court, to which we subscribe and refer for a better exposition of the subjects. We shall do not more than show what, in our judgment, the several patentees gave the art and what the defendant is doing, and whether, in consequence, he is infringing.

**Herzog Patent (Claims 1, 6, 8, 32, 45, 50, 60, 86, 91, 94).**

[1] Herzog applied for the patent in suit in 1893. Assuming the trial court was right in finding prior public use in 1891, Herzog made his invention when the art of elevator signalling was in its infancy. Before that time buildings were small and low, and one or two elevators served all purposes. When an intending passenger standing on a given floor wished to take an elevator up or down he simply pressed a button which closed an electric circuit and transmitted a signal to the elevator and the operator was apprised by light or lamp, or dropping shutter or other suitable device of the floor from which the passenger had sent the signal. The signal thus given remained on until the operator by joggling the indicator or annunciator broke the circuit and restored the system, which he did whenever he chose, either before reaching or after leaving the floor of the passenger. But in 1901 buildings were growing higher and, as they required more service, elevators were placed in small groups of two or three. Then the problem of the passenger and elevator operator became more complex. Where, for instance, there were three cars in a group, each having its own signalling system, a passenger on the sixth floor of a building, who, wishing to go down, had pressed the button of one of them, might stand there and to his annoyance see two cars pass down before the one he had signalled reached his floor. If, after several experiences of that kind, he were to press the buttons of all three cars he would, of course, take the first that came along and in doing so he would cause the other two to stop uselessly, and to the delay and annoyance of their passengers. To obviate these difficulties Herzog saw the desirability of having the signal which had been given to one elevator transmitted to the others. There was of course nothing inventive in this observation. Nor was there invention in extend-

ing an electric circuit from one elevator to three elevators.

Hence, when by pressure of one button a signal was given to three elevators at different distances from the floor of the passenger, it became necessary, in order that all three should not stop, to let the operator in two know when the operator in one had stopped and taken on the passenger. Herzog did this by having the operator whose car first arrived at the desired floor joggle the annunciator and thereby break the circuit. With the circuit thus broken the lights would go out and the signals be cancelled in the other cars and the system opened or "restored." Thus Herzog, by a single system circuit, extended to a group of elevators the practice of electric signalling and cancelling of signals by manual movement at the will of the operator theretofore pursued in a single elevator. The specific method by which he gave and cancelled signals was by making and breaking the electric circuit, which was old, and the specific means he used to do this, which was new, was a pivoted armature which when the button was pressed inward was attracted by a magnet to make electric contact and to hold the circuit closed after the passenger had withdrawn his finger and which, on the magnet being de-energized by the joggling action of the operator, was restored and the circuit broken or opened. If Herzog's conception was inventive its essence lay in the means provided for the restoration of the circuit. The operation of the means was manual and the system was therefore distinctly of that type. But Herzog came into the art just before buildings of many floors and great heights were constructed. They came a year or two later and with them came a real problem of signalling many elevators arranged in banks, sometimes as high as twenty in number. Here there was no time for hand cancelling of signals and hand restoration of circuits. So the idea of automatic signalling quickly entered the art. Armstrong, if not the pioneer, was certainly the greatest contributor to this new phase.

To Armstrong several patents were granted; the principal one, No. 499,411, was applied for and granted in the year 1893. The whole inventive concept of the invention it covered was, in a word, automaticity. In disclosing specific means for carrying out this conception and in making the first solution of a new problem, the patent was, to say the least, unusual, for, while its means have been improved in detail, the art has not in more than thirty years departed from their underlying features. These, given not in technical description but in abstract, are parallel wiring of the circuits as distinguished from Herzog's single system circuit, commutators in the car branches to control floor lamps and restoration according to the position of the car in its ascent or descent, the floor lamps themselves as means for identifying the approaching car, directional means to select floor lamps and restoration magnets corresponding to the direction of movement of the car, the mechanical latch at the floor box as a means for closing the signal circuit and the restoration magnet constructed, on being energized, to release the mechanical latch and clear the signal. In this arrangement the car operator had no control and no duty to perform with reference to clearing the signals or restoring the circuit. His sole duty was to obey signals. The only similarity we can discover in Armstrong and Herzog is that, in both, signals were made by closing a circuit and were cancelled by breaking it, which was old in this and other arts, particularly in the patents to Holmes, No. 121,620, and to Milliken, No. 407,101. Restoring the system by breaking or opening the circuit is the important thing which Herzog said he did.

Recognizing the value of the Armstrong invention, the plaintiff, prior to 1898, obtained a license under his patent and in 1900 purchased it. It also purchased the Opdyke patents, Nos. 572,561 and 572,562, granted in 1896. It acquired the applications of Smalley and Reiners and of Collett and patents for their inventions, Nos. 634,220, 634,229 and 700,619, issued to it in 1899 and 1902. It owned the McLean patents, No. 748,408 and No. 748,409. Thus by 1913 the plaintiff had become possessed of forty or more patents and had acquired a complete monopoly of this rapidly growing art, which under our patent laws was lawful and entirely proper. Armstrong had created the art of automatic elevator signalling and Opdyke and Smalley and Reiners had contributed well-defined improvements. These three men were the principal actors in the art. But it was known that on June 3, 1910, the Armstrong patent would expire and would leave the plaintiff with no patent that would dominate the art. The Opdyke and Smalley and Reiners patents were for improvements which though desirable were not essential. In this situation the plaintiff, late in 1910, obtained from Herzog a license under his then still pending application for the patent in suit, which was an exclusive license as to elevator signalling. The plaintiff then caused the Herzog application, which had been filed in 1893, to be prosecuted to final action,

which occurred on May 28, 1912, when the patent issued, nineteen years after its application date and containing ninety-seven claims which through this long period of the growth of the art had by amendment been added in place of the original eight.

In 1913, after the Armstrong patent had expired and the Herzog patent had issued, the defendant determined to engage in the business of installing elevator accessories. Knowing the plaintiff's commanding position in the industry, the defendant wrote it a letter, indicating his purpose and asking for the numbers of the patents under which it was operating so as to avoid any possible infringement. The plaintiff's response included the numbers and names of expired patents as well as of unexpired patents. All these the defendant submitted to expert examination and determined to embark in the business of manufacturing and selling apparatus which he conceived would be wholly within the expired patents, notably Armstrong, and which would not infringe any of the plaintiff's unexpired patents, notably the Herzog patent in suit. To the inventions of these expired patents he added improvements of his own and manufactured and sold, among others, the alleged infringing apparatus.

The novel feature of the Herzog invention, running through all the claims of the patent in more or less detail language, is, as stated by the plaintiff in its brief, the means "to signal a multiplicity of cars and yet, by an apparatus corresponding to any one car, clear the signals of all the cars." This, perhaps, involved invention. But this is not all the plaintiff claims. It maintains that Herzog, being the first to observe the problem of cancelling signals and restoring circuits in a multiplicity of cars and being first to provide means to solve that problem, made a pioneer invention which dominates all later inventions under patents for automatic means by which to do the same thing. In other words, the plaintiff urges in substance that Herzog's invention consisted in his concept of a restoration of signals in a battery of elevators and that any one who restores signals in a multiplicity of cars infringes. Restoration of the circuit became an obvious need of the art when the art of elevators was expanded by the requirements of high buildings. In the mere discovery of that need there was nothing inventive. Invention resided only in the way the need was met. Herzog met it by employing what in modern experience was an inadequate single system circuit running to all cars, to be made and broken in the old way of making and breaking electric circuits

and, in the latter movement, by means which was specific and which, if novel, may involve invention. To that specific means we think the invention is limited. As no patent has been granted Herzog or any one else for the concept of restoration, the defendant was free to include means to that end in his construction. He did it by taking the invention of Armstrong, whose patent had expired, and by improving upon it in a manner which (distinguishing Herzog) is told in sufficient yet not in full detail in the opinion of the learned trial court. On these grounds we are satisfied that the defendant has not infringed the Herzog patent.

### Newell Patent (Claim 22).

[2] The invention of this patent is intended either to make or cheapen mechanism for meeting the problem of permitting a loaded car to pass the floor of an intending passenger and leave the signals set, later to be restored by the car that stops. In Armstrong the signals were restored when the car passed the floor. This fault was corrected by Smalley and Reiners, but the correction involved the requirements of a conscious act on the part of the operator. McLean apparently met that infirmity. Thus each of the named inventors improved upon his predecessor.

Newell claims to have improved upon all by a mechanism which enabled a full car, without any act of the operator, to pass a floor without restoring the circuit, and obviated the defects of both Smalley and Reiners and McLean though retaining their advantages. He provided a construction by which an operator (a) if he did not do anything could pass a floor without restoring, (b) could only restore the circuit of the particular floor where the car was, and (c) then only unconsciously by some act which necessarily took place at, during or because of the stopping of the car to take on the passenger. Newell, it is claimed, did this by providing a circuit-selecting commutator which selected the restoring magnets in accordance with the movement of the car so that only the magnet where the car then was could be energized.

We had determined in deciding the issue of infringement of the Newell patent to adopt the opinion of the learned trial court in respect to that patent as our own, for it accurately and fully expresses the judgment at which we had arrived, when counsel for the plaintiff presented for our consideration an opinion of the District Court of the United States for the Southern District of California in a case of this plaintiff against Randall Control Hydrometer Corporation. In

that case the trial court sustained the claims of the Newell patent there in suit, including claim 22 here in suit, and found them infringed. The force of that decision is two-fold: First, that the claims are valid, which we may assume without deciding; and second, identity of the alleged infringing apparatus with the invention disclosed by the claims. On this latter matter we are, because of the brevity of the opinion, wholly uninformed. However, we assume it to be true, but the identity of the structures of the patent and of the infringer in the California case throws no light on the issue of infringement raised under the same claim in the suit at bar.

While the Newell patent calls for circuit control "preferably through operation of the gate mechanism" it does not show and therefore does not inform us through what other mechanism control by the invention of the patent is to be exercised. The defendant's structure lacks this feature and contains nothing that is controlled directly or indirectly by a door or gate. It has nothing relating to the restoration of signals which is controlled by anything except automatically with the operation of the car itself. In its restoration circuit the old commutators of Opdyke and Smalley and Reiners are employed in series with the defendant's patented governor switch co-ordinating with the motor circuits of the car and operating when closed, and momentarily, upon the acceleration of the car away from the floor at which it stopped. It is effected by the starting of the car itself after coming to a stop which completes the restoration of the circuit. Its operation is automatic, depending in no sense upon the act of the operator. Our finding is against infringement.

### Andren Patent (Claims 2, 9, 10, 11, 12, 14).

[3] The claims of this patent, except claims 2, 9 and 11, were in suit in Elevator Supply & Repair Co. v. New & Beaver Arcade Co. et al., 231 F. 744, 146 C. C. A. 28 (C. C. A. 2d). Claims 2, 9 and 11 seem limited to a restoring means which is a limitation in claims 10 and 12. So the scope of the claims of the patent here in suit has previously been decided in the other action between the same parties, the defendant here having made the installation there concerned. To the defense of res judicata, identity of parties and of causes of action is established. Identity of the two installations remains to be determined. We have found differences which we are not satisfied are substantial; nor are we satisfied that they are unsubstantial. We are therefore slow to dispose of the case on the plea of res judicata. The decision of the Circuit Court of Appeals for the Second Circuit is, however, of value for we find ourselves in accord with the narrow construction there given the claims and hold that, so construed, they are not infringed.

Error in taxing costs specified by the fifth assignment is found; therefore recovery from the plaintiff of these costs amounting to $398.91 and apportioned among the separately numbered suits is denied.

When modified in this respect, the decree in each case will be affirmed.

### On Petition for Rehearing.

PER CURIAM. From a misstatement of what in one particular was old in the art of elevator signalling, the appellant thinks we misunderstood the art and, accordingly, misconceived and erroneously decided the issue in the case of the Herzog patent. After reviewing the case in the light of the petition for rehearing, we find that—though in the intricacies of the mechanism it were easy to do so—we did not misunderstand what we were about. In limiting the scope of the Herzog patent we doubtless misled the appellant by a restricted statement of the invention and by seemingly basing our decision on a misconception of the prior elevator signalling art, when as a matter of fact—the problem being one of signalling—we based our decision (as the opinion shows) on the entire signalling art which included telephones, telegraphs, fire signals, room signals, railway signals, etc.

The petition in respect to the Newell and Andren patents presents nothing we had not already considered.

The petition is denied.